## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

———————————————

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                       CR No.  00-485 JP

MARK ARNOULD,

        Defendant.


### MEMORANDUM OPINION AND ORDER

At a July 20, 2000 hearing on Defendant's Motion to Suppress Evidence and Supporting Memorandum, filed June 15, 2000, (Doc. No. 25), Defendant was present and was represented by Michael Keefe; the Government was represented by Rhonda Backinoff.  Having carefully reviewed the briefs[1] and the applicable law, I conclude that the motion should be denied.

### FACTS

At the hearing, Albuquerque Police Officer James B. Arrington testified for the Government.  Defendant proffered the testimony of four witnesses: Charles Vigil, Fletcher Johnson, Eduardo Contreras, and Marlys Arnould.  The testimony and the exhibits admitted at the hearing established the following facts.

On March 28, 2000 Officer Arrington was conducting surveillance at 723 Alvarado N.E.

---

[1] The argument section of the Government's brief is copied almost verbatim from the section on inventory searches contained in the Georgetown Law Journal's Annual Review of Criminal Procedure.  *See* Matthew J. Gardner, Amy Manning & Audrey Benison, Twenty-Eighth Annual Review of Criminal  Procedure, 87 Geo. L.J.  1176-80 (1999).  In the future, the Government should properly cite the authorities on which it relies.

in Albuquerque, New Mexico.  The Albuquerque Police Department knew the house was

involved in the manufacture and distribution of methamphetamine.  (Tr. at 8.)  Officer Arrington

had driven by the house at 723 Alvarado numerous times and had conducted surveillance of it and

the vehicles that stopped at the house.  (Tr. at 7.)  Officer Arrington, and other officers, had

caught several wanted people and had found stolen vehicles through their surveillance of 723

Alvarado.  (Tr. at 9.)  Officer Arrington testified that he had stopped suspects associated with 723

Alvarado on the basis of "a traffic violation, a registration violation or actually a subject that we

recognized as being wanted."  (Tr. at 47.)

Although Officer Arrington had never met Defendant, he knew from talking with other

officers that Defendant drove a brown 1981 Chevy pickup truck.  (Tr. at 11.)  At approximately

1:00 p.m. Officer Arrington spotted Defendant's truck outside 723 Alvarado and ran a license

plate check to verify that the vehicle belonged to Defendant.  (Tr. at 11.)  Having verified that

Defendant owned the truck, Officer Arrington initiated surveillance of the house.  (Tr. at 12.)

Officer Arrington also determined that Defendant had two outstanding warrants for his arrest and

that his driver's license had been suspended.  *Id*.  During his surveillance, Officer Arrington saw

Defendant leave the house at 723 Alvarado, get into the cab of his truck, unlock the toolbox in

the bed of the truck, remove something from the toolbox, and return to the home with that item.

(Tr. at 16-17.)   At approximately 1:30 p.m. Officer Arrington called for back-up.  (Tr. at 45.)

Sometime later, Defendant left the house, returned an unidentified item to the toolbox, and drove

away in his truck.  (Tr. at 17.)  According to Officer Arrington, Defendant was driving erratically,

as if "he was trying to lose what he perceived as surveillance on him."  (Tr. at 18.)

At Officer Arrington's request, a marked police car driven by Officer Gonzales stopped

Defendant's vehicle at approximately 3:40 p.m. in the back parking lot of a strip mall at the corner of Copper and Cagua. (Tr. at 18-19, 26.)  Officer Arrington observed Defendant exit his truck, lock it, and walk towards Officer Gonzales.  (Tr. at 19.)  Officer Arrington then joined Defendant and Officer Gonzales.  (Tr. at 19.)  Defendant produced his driver's license, registration, and insurance.  (Tr. at 20.) Defendant appeared nervous.  *Id.*  Officer Arrington advised Defendant that he had two warrants out for his arrest, and Defendant indicated that he knew that.  (Tr. at 20.)  Defendant was surprised, however, when Officer Arrington informed him that his driver's license had been suspended.  (Tr. at 21.)  Based on the two warrants, Officer Arrington arrested Defendant.  (Tr. at 21.)

At some point, Detectives Hart, Headcroft, and Wolf all arrived on the scene, (Tr. at 26,) and Officer Arrington called for a tow truck.  Officer Arrington told Defendant why his truck was being towed and why an inventory search was needed.  (Tr. at 27.)  The officers began an inventory search using a form titled "Albuquerque Police Department Tow-In Report," (Ex. 2), to list the contents of Defendant's truck.  Officer Arrington asked Defendant if he had anything illegal, any weapons, or anything of value in his truck and Defendant replied "no."   (Tr. at 26.) After Officer Hart found a shotgun in the cab of Defendant's truck, Officer Arrington asked Defendant again whether there were any illegal items in the truck, and Defendant said "no."  (Tr. at 27-28.)   After Detective Hart found three more weapons in the cab of Defendant's truck, Officer Arrington advised Defendant of his *Miranda* rights and asked him for the key to his toolbox.  (Tr. at 28-29.)  Defendant responded that he did not have a key to open the toolbox, but Officer Arrington knew this to be untrue because he had observed Defendant open the toolbox when the truck was parked outside 723 Alvarado.  (Tr. at 29.)  Officer Arrington eventually

3

found the key to the toolbox on Defendant's key ring.  (Tr. at 29.)  Defendant's nervousness and anxiety increased as Officer Arrington was looking for the toolbox key.  (Tr. at 30.)

Officer Arrington also told Defendant that "in the past we've had problems with items that were of extreme value in vehicles that ended up missing and they reported up missing and I was joking with him, saying 'I don't know if you have four million dollars worth of something in there but I've got to check.'"  (Tr. at 31.)  Defendant responded that he had a four-million dollar bond located in a surveyor's map tube, wrapped in newspaper, inside the toolbox.  (Tr. at 31, 66.)

As Officer Arrington opened the toolbox he detected the strong odor of chemicals he associated with the manufacture of methamphetamine.  (Tr. at 67.)  Officer Arrington found the bond in the toolbox and gave it to Defendant.  (Tr. at 31.)  Officer Arrington also found in the toolbox evidence consistent with the manufacture of methamphetamine, including clear plastic, tubing, carefully packed glassware, several cans of starting fluid, and red phosphorous. (Tr. at 32; Ex. B.)  Defendant stated that the items in the toolbox belonged to a friend but refused to identify that person.  (Tr. at 38.)

Officers also discovered a small footlocker in the bed of the truck that contained a large assortment of glassware, stoppers, and other items commonly used in a methamphetamine lab. (Tr. at 33.) A number of other items, such as clothes, tires, and home renovation objects were also in the bed of the truck.  (Ex. 2, 3.)  Officers filled out evidence tag forms, (Ex. 4), listing the evidence of criminal activity found in Defendant's truck.  Officer Arrington's "State of New Mexico Supplemental Report," (Ex. 5), also lists evidence of criminal activity found in Defendant's truck.

At approximately 7:00 p.m. Defendant's vehicle was towed.  (Tr. at 57.)  Defendant had

4

at least two friends, Charles Vigil and Fletcher Johnson, who, if they had been called by the officers, would have been available to pick up the truck from the parking lot.

When the Defendant's mother, Marlys Arnould, picked up his truck the next day at the place where it had been towed, the bond that Officer Arrington had given Defendant was in the cab of the truck.[2]  (Tr. at 77.)  Also in the bed of the truck was a typewriter, two swords, a suit, and insert for a gas fireplace.  *Id*.  None of these items was listed on the Tow-In report or on any other inventory list.  Ms. Arnould also found in the truck the keys to the ignition, but there was no inventory list in the truck.  (Tr. at 78.)

---

[2]  Defendant's fourth witness, Eduardo Contreras, is an investigator.  His proffered testimony concerned the photographs, which were admitted into evidence without objection, of the parking lot where Defendant's truck was stopped.

5

## LAW

One of the well-established exceptions to the Fourth Amendment's warrant requirement is an inventory search. *See Colorado v. Bertine*, 479 U.S. 367 (1987); *South Dakota v. Opperman*, 428 U.S. 364 (1976). "When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody; the protection [of] the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *Opperman*, 428 U.S. at 369 (citations omitted). "[I]nventory searches are reasonable only if conducted according to standardized procedures." *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997) (citing *Bertine*, 479 U.S. at 377 (Marshall, J., concurring)). It is impermissible to use an inventory search as a "ruse for a general rummaging in order to discover incriminating evidence." *Id*. at 772-73 (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990)). Instead, it may only be used as "an administrative procedure designed to produce an inventory." *Id*. (citing *Wells*, 495 U.S. at 4).

## DISCUSSION

The first issue to be decided is whether the officers' decision to impound the vehicle was lawful.[3]  *See United States v. Kornegay*, 885 F.2d 713, 716 (10th Cir. 1989), *cert. denied*, 495 U.S. 935 (1990).  If the impoundment was lawful, the second issue to be decided is whether the inventory search was necessary.  *See id.*

### Impoundment of Defendant's Vehicle

Section 2-48 of the Albuquerque Police Department policy states, "[d]epartment policy is to authorize the towing of vehicles when necessary as a matter of public safety, to protect property, to preserve evidence, and to remove abandoned vehicles from city streets and property." (Ex. 1-A.)  Rule 2-48-2(A.) states, "VEHICLES WILL BE TOWED WHEN [ ] [t]he driver has been . . . arrested, when the vehicle cannot be released to a responsible party."  Officer Arrington testified that he interprets Rule 2-48 as requiring a vehicle to be impounded when a person is arrested in order to protect the city against claims of vandalism and theft.  (Tr. at 23.)  He also testified that he towed Defendant's vehicle because he was concerned that leaving it--and the exposed items in the bed of the truck--overnight at the parking lot would result in the truck and its contents being stolen or vandalized.  (Tr. at 69.)

Defendant argues that Rule 2-48-2 requires that a vehicle be impounded only when a responsible party is unavailable to pick up the vehicle.  In support of this argument Defendant relies on *United States v. Pappas*, 735 F.2d 1232 (10th Cir. 1984).  In *Pappas* the defendant's car was legally parked in the parking lot of a local bar when he was arrested.  *See id.* at 1233.  The

---

[3] Defendant does not contest the legality of the stop of his vehicle or the search of the cab of the truck.  (Tr. at 50.)

7

officers impounded the defendant's car under the city policy, which "required the impounding of any vehicle whenever an arrest takes place, regardless of the circumstances." *See id*.  At the time of his arrest, the defendant was accompanied by a friend who could have driven the car to the police station.  *See id*. at 1234.  The defendant had other friends present who could have been asked to take the car into custody.  *See id*.  The defendant was a well-known person in the community.  *See id*.  His family lived close by and could have been called to take care of the car. *See id*.  The bar owner could have been asked if defendant's car could be left in the bar's parking lot until he returned.  *See id*.  Based on these facts, the trial court found that the alternatives to impoundment sufficiently protected the officers from any potential claims against them.  *See id*. Therefore, the district court judge suppressed the evidence found during the inventory search of the defendant's vehicle.  *See id*.  The Tenth Circuit upheld the district court decision, stating, "[i]n this case the car was parked on private property and there was no need for the impound and inventory search."  *Id*.

This case is distinguishable from *Pappas*.  Unlike in *Pappas*, the Defendant did not have a friend or companion with him at the time of his arrest who could have taken responsibility for the vehicle.  Although in *Pappas* the officers could have asked the bar owner if the defendant's vehicle could be left in the parking lot, in this case the Defendant's truck was parked in the back lot of a strip mall and the officers had no indication that any of the owners of the shops in the strip mall would have been willing or able to give permission to allow Defendant's truck to remain in the back parking lot.  Because the bed of Defendant's truck was filled with a number of miscellaneous items, including the removable toolbox, the truck would have been an easy target

for vandals or thieves.[4]  Had the truck been vandalized or its contents stolen, the City would have been subject to liability for lost or damaged property.  Thus, this case is distinguishable from *Pappas* and is factually more similar to *Kornegay*.

In *Kornegay*, agents arrested the defendant in a company building after he had parked in the company's parking lot.  *Id*. at 715.  The agents inventoried the defendant's car using a standard inventory form and found cash, jewelry, and wallets in a bank bag.  *See id*.  The Defendant argued that the inventory search was unreasonable because his car was parked in a private lot, it was not blocking traffic, and its removal had not been requested.  *See id*.  The defendant relied on *Pappas* to argue that the impoundment of his vehicle was unlawful.  *See id*. at 716.  The court distinguished *Pappas* on the following grounds: 1.) the agents arrested someone's whose identity was unknown; 2.) the agents did not know where the defendant lived; 3.) the defendant was without a friend, relative, or companion who could care for the car; 4.) agents did not know what state the vehicle was from; 5.) the vehicle was not parked on the defendant's property and the agents did not believe the defendant would be returning soon to care for it; 6.) leaving the car in the company parking lot could have subjected it to vandalism or theft.  *See id*. Based on these facts, the Tenth Circuit concluded that "there is no evidence that suggests that the agents' decision to impound the car was other than proper and reasonable under the facts of this case."  *Id*.

Likewise, under the facts in this case, Officer Arrington's decision to impound Defendant's truck was proper and reasonable.  Although Defendant disputes that Rule 2-48-2

_____

[4] Officer Arrington testified that the parking lot was located in a high-crime area with "a high concentration of the transient motels there that are associated with a lot of auto thefts, burglaries, [and] vandalisms."  (Tr. at 69.)

automatically requires the impoundment of vehicles after a suspect's arrest, Officer Arrington's interpretation of Rule 2-48 as mandating the towing of a vehicle upon a suspect's arrest is justified by the language of the rule.  Because the bed of the truck was open, exposing the numerous items in the bed to theft, the officers could not have left the truck in the parking lot without subjecting the City to liability for theft and any vandalism to the truck.  Under these circumstances, the only other option available to the officers, besides having the truck towed, would have been to call Defendant's friends and relatives in order to see if anyone was available to pick up the truck.  To require officers to do this would create an unreasonable burden on them and interfere with their law enforcement duties.  Moreover, there is no evidence that Defendant asked the officers to call a friend or relative to see if such a person could and would come to the arrest scene to take possession of the truck.  Nor is there any evidence that Defendant gave the officers the name and phone number of anyone who might come get the truck.

**Inventory Search**

Defendant argues that the inventory search of his truck was an illegal investigatory search. In support of this contention, Defendant points to two facts: 1.) Officer Arrington suspected Defendant of being involved in the manufacture and sale of methamphetamine even before he ran the license plate check on Defendant's truck; and 2.) before Officer Arrington began the search of Defendant's truck he asked Defendant whether he had any illegal items or weapons in the truck.

Although *Opperman* allows for inventory searches, the Supreme Court's opinion "cannot be used to justify the automatic inventory of every car upon the arrest of its owner. The justifications for the rule are too carefully crafted for this to be the intent." *Pappas*, 735 F.2d at 1234. In *Pappas* the Tenth Circuit held that the inventory search of the defendant's vehicle was unnecessary and stated, "[i]n this case the car was parked on private property and there was no need for the [ ] inventory search." *Id*.

In *Kornegay* the Tenth Circuit found that the impoundment of the defendant's vehicle was proper and went on to consider "whether the inventory search was necessary and, if necessary, was extended too far by the opening of the bank bag." *Kornegay*, 885 F.2d at 716. The court noted that the district court had concluded that under *Opperman* and *Bertine* the inventory was reasonable because it was done under standard procedures for the purpose of securing the vehicle, protecting the defendant's property, and protecting the police from claims of lost, stolen, or vandalized property. *See id*. at 717. The district court had also concluded that without a showing that the agents sought to investigate criminal activity instead of to conduct a routine inventory, the search was not unreasonable merely because the car could have been left locked in the parking lot. *See id*. The Tenth Circuit affirmed the district court's ruling regarding the inventory, noting

11

that "an initial routine inventory was conducted pursuant to standarized procedures by a specialist in attendance for that purpose." *Id*. The court also concluded that the record "contains no showing that the inventory was a pretext used to investigate for evidence of criminal activity." *Id*.

Officer Arrington testified that he inventoried Defendant's truck because Albuquerque Police Department Rule 2-48-3(C.)(1.) requires it. (Tr. at 25.) Rule 2-48-3(C.)(1.) states that "[o]fficers will inventory the entire vehicle, including the . . . truck bed, truck boxes and all sealed and locked containers within." Rule 2-48-3(C.) states that "[o]fficers will inventory the property in the vehicle to be towed and list it on the Tow-In Report (PD-4012)." Officer Arrington testified that he complied with Rule 2-48-3(D.), which requires that a "copy of the tow-in report will be given to the owner operator or placed in their property if they are under arrest." (Tr. at 25-26.)[5]

At the hearing the Government introduced Exhibit 2, which is a copy of the Albuquerque Police Department Tow-In Report. At the bottom of the page is written "PD 4012," which is evidently the form number for the report and establishes that Officer Arrington used the standarized inventory form required by Rule 2-48-3(C.). The Tow-In Report contains a heading titled "Inventory of Vehicle," which lists sixteen items found in Defendant's truck. At the hearing, Defendant offered evidence that a typewriter, two swords, and an insert for a gas fireplace also were in the bed of the truck although they were not listed on the Tow-In Report. The Two-In Report does, however, list a number of items found in the bed of Defendant's truck

---

[5] Officer Arrington's testimony on this point was somewhat unclear. Although he testified that he complied with subsection D, when asked what action he took to comply with the rule, he said, "Mr. Arnould was informed where the vehicle was towed to." (Tr. at 26.) This response suggests Officer Arrington may not have left a copy of the Tow-In Report in Defendant's vehicle. It is unclear whether he gave it to Defendant.

that are not evidence of criminal activity.[6]  The inclusion of these items supports the conclusion
that the officers conducted the inventory search for administrative, not investigatory, purposes.

It is, as Defendant contends, likely that Officer Arrington suspected Defendant was
involved in the manufacture or sale of illegal drugs before stopping and arresting him.  However,
Officer Arrington testified that he arrested Defendant because of his two outstanding warrants.
Defendant does not contest the propriety of the stop itself.  Based on Officer Arrington's
testimony it appears that the officers "did the inventory because they were obligated to secure the
vehicle's contents."  *Kornegay*, 885 F.2d at 717.  This finding is supported by the fact that the
officers used the standard Tow-In Report form, PD-4012, to conduct the inventory search.  Thus,
Defendant presented no direct evidence that Officer Arrington used the inventory search as a ruse
to search Defendant's vehicle for contraband, *cf. United States v. Blaze*, 143 F.3d 585, 592 (10th
Cir. 1998) (holding that the officers' inventory search was unreasonable and stating that "officers
admitted when they opened the trunk they were searching for contraband, and at no time did the
officers make any attempt to catalogue the contents"), and, in fact, the evidence establishes the
contrary.

Moreover, Officer Arrington was obligated to open the toolbox once Defendant stated
that a bond worth four million dollars was wrapped in a tube inside the toolbox.  Officer
Arrington even explained to Defendant, in a joking manner, that the police were liable if valuable
items in towed vehicles turned up missing.  (Tr. at 31.)  Had Officer Arrington failed to open the
toolbox and retrieve the bond after learning of its value, he would have subjected the City to

_____

[6] In addition to several guns and drug-related items, the inventory list includes "misc.
Tools," "Misc. clothing," "misc. shoes," "tires," "walkie talkies," and "misc home renovation
items."  (Ex. 2.)

enormous liability in the event the bond later was missing.[7]  Because the evidence established that the officers' inventory search was conducted according to standarized procedures and was intended to protect Defendant's property and protect the City against claims of lost or stolen property, the search was reasonable.  *See Opperman*, 428 U.S. at 369 (stating purposes served by inventory searches).

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress Evidence and Supporting Memorandum, filed June 15, 2000, (Doc. No. 25), is DENIED.

_____
UNITED STATES DISTRICT JUDGE

---

[7]  Once Officer Arrington opened the toolbox, and thereupon detected the odor of chemicals associated with methamphetamine and found drug paraphernalia, he had probable cause to search the remainder of the truck bed.  *See United States v. Dennis*, No. 96-4086, 1997 WL 282870, at *1 (10th Cir. July 10, 2000) (holding that "officer had probable cause to search containers in the camper portion of a pickup truck after he smelled burnt marijuana and found marijuana cigarettes in defendant's pocket and in the passenger compartment").